UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SOUTHWEST RE, INC., and SOUTHWEST
REINSURE, INC.

       Plaintiffs,

v.

MSE DISTRIBUTING, INC., AUTOLADY,
INC., and JOHN SULLIVAN d/b/a GMF
ENTERPRISES, INC.,

       Defendants.

Case No: 10-CV-00935 MCA/LFG

## SOUTHWEST RE, INC. AND SOUTHWEST REINSURE, INC.'S AMENDED COMPLAINT FOR MALICIOUS ABUSE OF PROCESS AND DECLARATORY JUDGMENT

COMES NOW Southwest Re, Inc. and Southwest Reinsure, Inc. (collectively referred to as "SWRe") by and through its undersigned counsel, SAUCEDO LAW FIRM, P.C. (Christopher T. Saucedo), CROWLEY & GRIBBLE, P.C. (Clayton E. Crowley) and MENDEL BLUMENFELD, LLP, (David Abell), pursuant to rule 15(a)(1)(B) of the Federal Rules of Civil Procedure, and for its Amended Complaint for Malicious Abuse of Process and Declaratory Judgment against the MSE Distributing, Inc., AutoLady, Inc., and GMF Enterprises, Inc. (hereinafter sometimes called the "Agents"), states the following.

1)     This matter is about the malicious abuse of the arbitration process and an abuse of this judicial proceeding in an effort to ensnare Southwest Reinsure, Inc. and this court in the strong policy favoring arbitration and the narrow standard of review for judicial review of arbitration awards.

2)      Agents have maliciously abused this process by wholly ignoring the conditions to arbitration, dismissing the inconvenient objections of SWRe, concealing their dispute from SWRe, and leading the arbitrators to regions far outside their scope of their authority.

3)      Agents have acted in an egregious self-interested manner to ram through this Court their self-crafted arbitration award all in violation of their duties of good faith and fair dealing and trampled their obligation good faith and fair dealing fundamental principles of due process and basic fairness.

4)      This action seeks damages for the malicious abuse of process by Agents.

5)      This action, pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure, and initially brought pursuant to the similar rule from the New Mexico Rules of Civil procedure, seeks a determination as to the validity and enforceability of written documents and an arbitration provision within those written documents.

6)      This action seeks the vacatur of an arbitration award against Southwest Reinsure.

## PARTIES, JURISDICTION & VENUE

7)      Southwest Reinsure, Inc. ("Southwest Reinsure") is a New Mexico corporation, having its principal place of business in the State of New Mexico.

8)      Southwest Re, Inc. ("SouthwestRE") is a New Mexico corporation, having its principal place of business in the State of New Mexico.

9)      Upon information and belief, MSE Distributing, Inc. ("MSE") is an Arkansas corporation that does business in the State of New Mexico and Arkansas.  MSE's principal place of business at 124 S. Broadview, Greenbrier, AK 72058

10)    Upon information and belief, AutoLady, Inc. ("AutoLady") is an Alabama corporation that does business in the State of New Mexico and Alabama.  Autolady's principal place of business is One Perimeter Park South, Suite 100-N, Birmingham, AL 35243.

11)    Upon information and belief, GMF Enterprises, Inc. ("GMF") is a Michigan corporation that does business in the State of New Mexico and Michigan.  GMF's principal place of business is 1786 Majon, Highland, MI 48356.

12)    There is complete diversity of the parties and, as such, the parties are subject to the personal jurisdiction of this Court.

13)    Venue is proper in this judicial district because the parties conducted business within this judicial district.

## FACTUAL BACKGROUND

14)    Southwest Reinsure is in the business of reinsurance.  Southwest Reinsure is a wholly-owned subsidiary of SouthwestRE.  SouthwestRE focuses on products sold by automobile dealers, recreational vehicle dealers, financial institutions and other types of companies with the ability to sell insurance that complements their core products (such as automobile loans), but do not have the expertise to administer the insurance program.

15)    Southwest Reinsure is not the insurer, rather it is the "third party administrator" and provides administrative support of other insurer's products.  This includes providing dealer and claims administrative support, marketing materials, forms, claims review and adjudication, among other things.

16)    A sample list of the products administered by Southwest Reinsure includes (the "Product Portfolio" and each a "Product"):

    a)   Vehicle Service Contracts (for loan risk mitigation and maintenance);

3

    b) GAP Insurance (guaranteed auto protection);

    c) Credit Insurance (death, disability and unemployment products);

    d) Aftermarket Products (theft, appearance, tire and wheel coverage products);

    e) Limited Warranties (engine, powertrain, rental and towing coverages); and

    f) Recreational Vehicle Service Contracts (motor homes, travel trailers, fifth wheels, slide-out rooms, and pop-up campers).

17)    Products administered by Southwest Reinsure and made part of the Product Portfolio change from time to time.

18)    Southwest Reinsure has engaged a network of independent contractors (or agents) to provide on-site servicing and marketing of the Product Portfolio generally through an "Agent Agreement." The independent contractors offer the various Products in the Product Portfolio and supply forms and consumer marketing materials to automobile dealerships (the "Accounts").

19)    Agents are authorized to offer pre-determined Products in the Product Portfolio to all Accounts and potential accounts.

20)    The relationship is non-exclusive and the agent may sell other products to the Accounts.

21)    Agents are independent contractors and are not restricted from selling non-Southwest Reinsure products to Accounts.

22)    Multiple agents may offer Products to a single Account.

23)    Under the "traditional business" model, agents identify new accounts and market the various Products administered by Southwest Reinsure to those accounts.

24)    When a Product is sold by an Account (such as a dealership selling a vehicle service contract) the agent typically receives a commission.

4

25)     Commissions payable for the sale of such products differ for each Product and are payable to the independent contractor pursuant to a commission fee schedule for each product and for each Account.

26)     Under the "traditional business" model, the terms and conditions of the commission policy and the compensation payable to independent contractors, including incentives and other related terms, for a particular Product in the Product Portfolio are determined by SouthwestRE, set forth in the Commission Schedule A and Commission Addenda and may change from time to time.

27)     The Agents were independent contractors as described above.

### *Special Arrangement Governing the CAC Dealer Network Accounts*

28)     The single product in the Product Portfolio at issue in this dispute was a vehicle service contract offered by Credit Acceptance Corporation ("Credit Acceptance" or "CAC").

29)     CAC is a $1.5 billion publicly traded company with over $300 million in annual revenue.

30)     Since 1972, CAC has provided auto loans and financing to consumers through a nationwide network of CAC approved automobile dealers who benefit from sales of vehicles to consumers who otherwise could not obtain financing.

31)     Dealers preapproved to offer CAC financing are added to the CAC dealer network (the "CAC Dealer Network") and are permitted to offer CAC's vehicle service contract known as the Superior Protection Plan program (the "VSC Program").

32)     CAC has relationships with third party administrators ("TPAs") such as Southwest Reinsure, whereby the TPAs administer and process claims on the VSC Program.

33)     Affiliates of Southwest Reinsure, such as First Automotive Service Corporation or Dealers Alliance Corporation (collectively, the "SWRe Affiliates") issue the VSC Program contracts.

34)     Pursuant to the arrangements with CAC, SWRe Affiliates are authorized to engage agents to provide onsite support and marketing to the CAC Dealer Network and to pay such agents a commission specified from time to time by CAC.

35)     Upon adding a new dealer to its Dealer Network, and thus approved to offer the VSC Program to their consumers, CAC notified SouthwestRE, among others.

36)     SouthwestRE then supplied the identity of each new CAC Dealer Network member to one or more agents.

37)     Agents then contact the new CAC dealer and offer to provide marketing and customer support services in connection with the VSC Program for the benefit of CAC.

38)     If a CAC dealer selected the Agent to provide service marketing and customer support services in connection with the VSC Program, then the Agent would receive a commission from CAC and paid through SWRe for such services performed.

### *CAC's Servicing the CAC Dealer Network*

39)     Mid-year 2009, CAC formally notified SWRe of its intent to move the servicing activities to its own in house staff, specifically to the CAC's market area managers.

40)     Effective January 1, 2010 CAC would assume the exclusive responsibility for promoting the VSC Program to its Dealer Network through CAC's market area managers.

41)     The assumption by CAC of servicing and marketing was communicated to all SouthwestRE agents via a conference call held on October 2, 2009.

42)     Follow up letters repeating the terms of CAC's termination of the VSC Program Product were also sent to each of the agents.

43)     The change was unilateral and impacted all third party administrators and their agents, including SouthwestRE.

44)     Credit Acceptance paid commissions to agents for onsite support services on new CAC vehicle service contracts through December 31, 2009.

45)     Notably, this decision only affected those VSC Program contracts purchased by customers in the CAC Dealer Network.  The agents continued to service the remainder of the Product Portfolio, and continue to do so this day.

## SOUTHWESTRE'S RELATIONSHIP WITH THE AGENTS

### *The Agent Agreements*

46)     Each of MSE, Autolady and GMF executed a written document with SouthwestRE entitled "Agent Agreement" (collectively, the "Agent Agreements").  Exhibits A, B, and C to Agents'' Motion to Confirm Award (Dkt. 1).

47)     The Agent Agreement establishes the general relationship between the agents and SouthwestRE authorizing each agent to act for SouthwestRE as provided in the Agent Agreements including the servicing of Accounts and performing certain administrative functions for the Accounts.  Id.

48)     Among the services provided were the marketing of SouthwestRE's Product Portfolio, specifically, "Service Contracts, Credit Insurance and Ancillary Products to automobile dealerships."  Id. First Recital.

49)     The duties include acting as custodian of insurance certificates, assisting SouthwestRE in the collection of premiums and other fees, instructing the Account "as to the

proper completion of insurance certificates, as well as the proper reporting and transmittal procedures for the premium collected in the Account." Id. at ¶¶ 3, 4 and 6.

50)     The Agent Agreement, among other things, limits the Agent's authority, obligates payment of refunds for cancelled policies, and submission of a commission fee addendum for each new Account. Id. at ¶¶ 1, 7, 11 and 12.

51)     No provision of the Agent Agreement contemplated any compensation in perpetuity for any account or Product whether prior to or following termination of the Agent or the removal of the Product from the Product Profile.

52)     Conversely, Section 13 of the Agent agreed to accept and SouthwestRE agreed to pay, "as full and reasonable reimbursement for _services performed_," commissions as set forth in a commission fee schedule attached to the Agent Agreement.

53)     Section 13 of the Agent Agreement is consistent with the manner in which agents were compensated for sales of VSC Program contracts by CAC Dealer Network.

### _The Commission Fee Schedule_

54)     Section 11 of each Agent Agreement required the attachment of a "Schedule A" intended to outline the compensation each SWRe would receive for each Account serviced by SWRe. Schedule A, the terms relating to compensation, constituted a material term of the arrangement between Agents, SouthwestRE and the underwriter.

55)     None of the Agent Agreements with MSE, GMF or Autolady contained an executed Schedule A.

56)     Neither the Agents nor SouthwestRE complied at any time with the requirement to attach a Schedule A to their respective Agent Agreement.

57)     No Schedule A set forth the compensation terms for providing services to support the CAC Dealer Network or sales of service contracts under CAC's VSC Program.

### *The Commission Fee Schedule Addenda*

58)     Each Agent Agreement required under Section 11 that the SWRe "is responsible for providing [SouthwestRE] an addendum to this agreement for each new account" (each a "Commission Addendum"). Id.

59)     Section 11 of each Agent Agreement provided that each Commission Addendum "will follow the format of the attached Schedule A and will be signed by [SWRe] before being submitted to [SouthwestRE]." Id.

60)     Section 12 of the Agreements provided that the "Commission Fees for any subsequent ACCOUNT added by AGENT shall be set forth in a signed Addendum to this agreement which shall become part hereof." Id. at ¶ 12.

61)     Each Agent's obligation set forth under Sections 11 and 12 to provide a Commission Addendum for each subsequent Account was material to their respective Agent Agreement.

62)     At no time did any Agent submit a Commission Addendum to SouthwestRE as required by their respective Agent Agreement.

63)     No Commission Addenda set forth the compensation terms for providing services to support the CAC Dealer Network or sales of service contracts under CAC's VSC Program.

64)     The Agent Agreements were not applicable to the compensation terms for providing services to support the CAC Dealer Network or the sales of service contracts under CAC's VSC Program.

### *CAC Dealer Network VCS Program Commissions – A Special Case*

65)     A portion of each CAC vehicle service contract purchase price paid by the consumer was set aside by CAC as compensation to the agent for services rendered ("CAC Commission").

66)     The amount of CAC Commission paid to the Agents supporting SWRe and other TPAs changed from time to time, but immediately preceding the January 1, 2010 termination, was $75.00 per VSC Program contract.

67)     Because the CAC Dealer Network accounts were pre-approved by CAC and subject to a flat commission payable by CAC pursuant to a separate, third-party arrangement, Agents were allowed to enroll new accounts without the submission of a Schedule A or Commission Addenda.

68)     Southwest Reinsure delivered the Agents' commissions not in reference to the Agent Agreement but as a conduit pursuant to the agreed compensation payable by CAC.

### *Agent Agreements Not Terminated*

69)     Section 20 of each Agent Agreement provides a mutual right of termination: "This Agreement may be terminated by either party upon thirty (30) days' notice to the other party." Id. at ¶ 20.

70)     The Agent Agreement did not provide for the payment of compensation following the termination or amendment of the Agent Agreement or the modification of the Product Portfolio, particularly for products no longer available to the agents.

71)     The Agent Agreement did not provide for the payment of attorneys' fees in the event of a dispute.

72)     At all times material hereto, the Agent Agreements remained in full force and effect.

73)     SouthwestRE desired that the agents continue to provide services, particularly, the servicing and marketing of all the non-CAC Products in the Product Portfolio to new and existing accounts.

74)     Following the change in CAC's VSC Program, SouthwestRE desired that the agents continue to build their "traditional business" by marketing the Product Portfolio and did not terminate the Agent Agreements.

## CONDITIONS PRECEDENT TO ARBITRATION

### *Conditions Not Satisfied*

75)     Each Agent Agreement contains an identical provision Section 17 entitled "Arbitration" which states in part that "[i]f an irreconcilable difference of opinion should arise between the parties as to the interpretation of this agreement and the dispute cannot be resolved informally, the dispute shall be settled by arbitration" (the "Arbitration Provision").

76)     The Arbitration Provision is limited in its scope and makes a dispute subject to four conditions precedent to arbitrability.

77)     A matter is only arbitrable under Section 17 of the Agent Agreement if (1) an irreconcilable difference of opinion exists between the parties, (2) the difference of opinion exists as to the interpretation of the Agreement (3) the dispute cannot be resolved informally and (4) that the parties submit their differences to three (3) arbitrators.

### *Condition 1:  Irreconcilable Differences of Opinion*

78)     No irreconcilable difference in opinion existed between the parties prior to the Arbitration Demand.

79)     At no time did the parties enter into negotiations or discussions relating the interpretation of the Agent Agreements prior to the Arbitration Demand.

80)     At no time did the Agents assert any interpretation of a provision of the Agent Agreement that could have formed the basis of an irreconcilable difference.

81)     At no time was there a mutual determination made by the parties that their respective opinions or positions regarding the interpretation of the respective Agent Agreements were irreconcilable.

82)     A unilateral determination that differences are irreconcilable is an impossibility if one party is unaware of the matters in dispute and the underlying claims and damages.

83)     Until Agents' delivery of an arbitration notebook several weeks after the conclusion of the Arbitration Proceeding, SouthwestRE and Southwest Reinsure were substantively unaware of the matters in dispute and the underlying claims and damages ultimately asserted by Agents.

84)     Agents failed to satisfy the first condition precedent to arbitration.

### *Condition 2: Subject Matter Relates to Differences of Opinion Regarding Interpretation of the Agent Agreement*

85)     The lack of a Schedule A (the commission fee schedule) and the failure of the Agents to submit Addenda rendered the second condition precedent to arbitration an impossibility, specifically, there could not be an irreconcilable difference of opinion regarding the interpretation of the Agent Agreement (compensation provisions) if they were not part of the Agent Agreements.

86)     The terms and conditions of the commissions payable to the Agents were the subject of agreements between affiliates of SouthwestRE and third-party insurers.  Such terms were not part of the Agent Agreements and thus outside the scope of the Arbitration Provision.

87)     The terms and conditions of the commissions payable to the Agents were the subject of the policies of and determined by the third-party insurers.  SouthwestRE acted as a conduit for commissions paid to the Agents on the Products in dispute.  Such terms were not part of the Agent Agreements and thus outside the scope of the Arbitration Provision.

88)     Agents failed to satisfy the second condition precedent to arbitration.

### *Condition 3: Dispute Cannot be Resolved Informally*

89)     The Agents never attempted to resolve their claims informally.

90)     Agents never delivered a demand for payment of compensation allegedly due.

91)     Agents never communicated to SWRe the basis for their demands, if any.

92)     Agents never informed SWRe of the specific Accounts that were in dispute.

93)     Agents never informed SWRe that their dispute arose out of their respective Agent Agreements.

94)     Agents never informed SWRe of the provision or provisions of the Agent Agreements that were in dispute.

95)     Agents never engaged in any substantive discussions, communications or established any material contact with SWRe or any of its affiliates in an attempt to resolve their claims informally.

96)     Agents never made an offer of settlement of the dispute.

97)     SWRe never rejected an offer of settlement from Agents.

98)     Unaware of the substance of Agents' claims, SWRe was never afforded the opportunity to formulate an offer of settlement and, in fact, never offered any terms for settlement.

99)     Agents had an affirmative obligation under the Agent Agreements to make a good faith attempt to disclose their claims and to engage SWRe in an attempt to resolve such claims informally.

100)    The Agents' breach of this obligation rendered the third condition precedent to an arbitrable claim unsatisfied and an impossibility under the circumstances.

101)    SWRe regularly resolves disputes with agents informally and reasonably believes that the Agents claims could have been resolved in the regular course of business.

102)    Agents failed to satisfy the third condition precedent to arbitration.

103)    The Agents had an affirmative obligation to apprise SWRe of their claims in connection with satisfaction of the first three conditions to a right to arbitrate under the Arbitration Provision.

### Condition 4:  Parties Must Submit Differences to Arbitrators

104)    Finally, Agents' had an affirmative obligation to apprise SWRe of their claims, including its interpretation of the agreements.  The breach of this obligation prevented SWRe from submitting its "differences" to the arbitration panel as required by the Arbitration Provision.

105)    Agents' willful misconduct or bad faith prevented SWRe from submitting it differences with Agents interpretation of the Agent Agreements, making the satisfaction of the condition an impossibility.

106)    Agents failed to satisfy the fourth condition precedent to arbitration.

107)    If any of the conditions precedent to arbitration is not satisfied, then a matter is not subject to arbitration under the Agent Agreement.

108)    As alleged above, due to the willful actions of Agents, not a single condition precedent to arbitration was satisfied other than SWRe's unilateral selection of arbitrators.

109)    The conditions precedent to an arbitrable matter implied that the arbitration agreement requires an irreconcilable difference of opinion in the interpretation of the agreement – this, at a minimum, requires that both parties understand the claims, are apprised of each party's interpretation and conclude that there is, in fact, an irreconcilable difference.

110)    Agents were represented by legal counsel at all times.  All notices delivered to SouthwestRE and responses to inquiries from SouthwestRE were prepared by Mr. Bartle, Agents' legal counsel.  Mr. Bartle, relying on the Arbitration Provision was fully aware of its requirements and, presumably, the duties of his clients and the relative rights of the parties.

### *Agent Agreements Lacked Terms Material to this Dispute*

111)    None of the Agent Agreements with MSE, GMF or Autolady contained an executed Commission Fee Schedule A.

112)    Neither the Agents nor SouthwestRE complied at any time with the requirement to attach a Schedule A to their respective Agent Agreement.

113)    At no time did any Agent submit a Commission Addendum to SouthwestRE as required by their respective Agent Agreement.

114)    As a result, neither the Agents nor SouthwestRE expected or anticipated that the Agent Agreement reflected the relationship and practice between parties with respect to Accounts that were not evidenced by Schedule A or a Commission Addendum, specifically, the CAC Dealer Network Accounts that are the subject of this action.

115)    As a result, the Agent Agreement did not establish the terms of the relationship and practice between parties with respect to the compensation payable to a Agent for CAC Dealer Network Accounts.

116)    The Agent Agreements did not include terms material to the payment of compensation, including but not limited to (a) the amount of compensation payable for a particular Account, (b) the timing of commission payments, (c) the accrual and vesting of compensation and (d) the duration of compensation payable on a particular account.

117)    In lieu of a written agreement or the operation of the Agreements, the Agents were fully compensated for their respective services as determined by the arrangements between CAC and SouthwestRE, its other insurance providers, verbal agreements and a standard practice between the Agents and SouthwestRE.

118)    The parties never expressed an objective manifestation of mutual assent to the material terms of the contract as they relate to compensation for particular Products, particularly CAC's VSC Program.

119)    The failure of the parties to attach a Schedule A and the failure of the Agents to submit a signed Commission Addendum for each account resulted in vagueness of expression, indefiniteness, and uncertainty as to any of the essential terms of each Agent Agreement, namely the terms relating to compensation for the CAC product.

120)    The terms material to compensation for the VSC Program were set forth in separate agreements.

121)    Such vagueness, indefiniteness and uncertainty as to material terms prevented the creation of an enforceable contract with respect to such terms.

### AGENTS' DEMAND FOR ARBITRATION AND ABUSE OF PROCESS

#### *Unilateral Arbitration under the Agent Agreements*

122)    Over nine months since SWRe's notice of CAC's assumption of the marketing of its VSC Program and over six months after the change was effective, Agents' counsel delivered a

16

letter dated June 21, 2010 to "Southwest Reinsure, Inc." in which they demand arbitration pursuant to the Agent Agreement (the "Arbitration Demand").

123)    Southwest Reinsure, Inc. is not a party to the Agent Agreements.

124)    In the Arbitration Demand, Agents assert for the first time that "irreconcilable differences of opinion have arisen" and that the "dispute cannot be resolved informally."

125)    Nowhere in the Arbitration Demand do the Agents describe the irreconcilable differences other than an "obligation to pay compensation to the Agents after terminating them."

126)    The Agent Agreements had not been terminated by SWRe or, based on understanding and belief, any other party.

127)    In the Arbitration Demand, Agents identified the first of three arbitrators, representing that he was an executive officer of an insurance company.

128)    On July 7, 2010, Agents identified a second individual, representing that he was an executive officer of an insurance company.

129)    On July 26, 2010, SWRe responded to Agents' counsel stating that it did not believe the arbitration demand to be valid and enforceable ("SWRe Response").

130)    In the SWRe Response, SWRe stated that it did not believe that there were "irreconcilable difference of opinion [regarding] the interpretation of [the Documents] and the dispute [could not] be resolved informally."  This was a condition to arbitration.

131)    SWRe also represented that the Agent Agreements had not been terminated.

132)    On August 4, 2010, Agents ignored SWRe's objections and asserted that they would continue with the arbitration process.

133)    On August 6, 2010, Agents requested that its two chosen arbitrators chose the third arbitrator for the arbitration panel.

134)   Upon information and belief, a third arbitrator was subsequently chosen and arbitration was unilaterally scheduled by the third arbitrator for September 8, 2010 in Albuquerque, New Mexico.

135)   On September 2, 2010, SWRe, through its undersigned counsel, informed Agents and the arbitrators that it would not participate in the unilaterally scheduled September 8, 2010 arbitration and that the issue was not subject to arbitration.

136)   On September 2, 2010, Agent's counsel instructed the arbitrators to ignore SWRe's objections and request for postponement and described it was a scheme to "thwart" the arbitration.

137)   On September 8, 2010, the three arbitrators, counsel for SWRe, counsel for Agents and the Agents met at the Hyatt Regency in Albuquerque, New Mexico and initiated the arbitration at 11:00 a.m. (the "Arbitration Proceeding")

138)   Agents counsel submitted an evidence binder to the arbitrators prior to the commencement of the Arbitration Proceeding (the "Agents' Arbitration Book").

139)   Agents, for the first time, disclosed its claims and evidence to SWRe's counsel at the initiation of Arbitration Proceeding by delivery of Agents' Arbitration Book.  Counsel for SWRe rejected Agents' Arbitration Book.

140)   The lead arbitrator initiated the Arbitration Proceeding by reading from a script contained in the Agents' Arbitration Book.

141)   Upon information and belief, the arbitrator's script contained in the Agents' Arbitration Book was prepared in advance by Agents' counsel.

142)     Prior to the commencement of the hearing, counsel for SWRe formally objected to the Arbitration Proceeding and moved that the panel adjourn the hearing pending the resolution of the declaratory action pending before the New Mexico state court.

143)     In addition, counsel for SWRe made numerous objections in support of adjournment or postponement to the panel, including, but not limited to:

  a) the failure of one or more of the conditions precedent to an arbitrable matter under the Arbitration Provision;

  b) the inapplicability of the Arbitration Provision;

  c) the process followed by Agents;

  d) the inability of SWRe to present a defense due to Agents procedural actions;

  e) the inability of SWRe to present a defense due to the lack of notice of the claims being asserted by Agents;

  f) the inability of SWRe to present a defense due to the lack of knowledge of the Agents' differences of opinion in the interpretation of the Agent Agreements;

  g) the fact that any differences of opinion related to matters outside the scope of the Agent Agreement and the Arbitration Provision;

  h) the inability to present a defense due to the lack of knowledge of the Accounts and other matters in dispute that were to be submitted before the arbitration panel by Agents;

  i) the failure of the Agents to submit their differences to the arbitrators;

  j) the failure of the Agents to submit their differences to SWRe, or any other party to the arbitration;

  k) the fact that Agents' lack of notice rendered SWRe unable to prepare and present

evidence, prepare and identify witnesses; effectively cross examine Agents' witnesses or to conduct any discovery for the benefit of the arbitrators in preparation of the Arbitration Proceeding;

l)   the failure of the Agents to provide any notice or to otherwise identify the specific provisions of the Agent Agreements that were subject to irreconcilable differences in opinion as to the parties respective interpretation;

m)  the fact that SWRe was never afforded the opportunity to present its interpretation of the Agent Agreement to Agents;

n)   the fact that SWRe was never afforded the opportunity to engage in an attempt to reconcile differences in opinion as to the interpretation of the Agent Agreements, if any;

o)   the fact that SWRe was never afforded the opportunity to engage in an informal dispute resolution with Agents prior to arbitration; and

p)   the pendency of the declaratory action before the New Mexico state court involving matters of law outside the authority and jurisdiction of the arbitrators, the resolution of which were material to the Arbitration Proceeding and any award of the arbitrators.

144)   The arbitrators overruled the objections and refused to suspend or adjourn the Arbitration Proceeding.

### *The Arbitrators – Failure to Qualify*

145)   The Arbitration Provision required the appointment of three arbitrators.

146)   The Arbitration Provision requires that the arbitrators "must be executive officers or retired officers of insurance companies . . . ." (emphasis added).

147)    The requirement that an arbitrator be an "executive officer" of an "insurance company" was intended to ensure that the arbitrators had executive management level experience and knowledge of issues specific to SWRe's insurance business and matters expected to be at issue in an arbitration.

148)    An executive officer, at a minimum, should be a position holding a position commonly identifiable as an executive officer and actually having management control and authority over the operations of the insurance company's business, ideally in the same industry as the Agents and SWRe.i

149)    The Agents', as the party selecting an arbitrator, had a duty to make a reasonable good faith effort to comply with the requirements set forth in the Arbitration Provision.

150)    Upon information and belief, none of the arbitrators satisfy the qualifications required by the Arbitration Provision.

### Mr. Thomas Dulick and Mr. Robert M. Goodside Not Qualified to Serve as Arbitrators

151)    Upon information and belief, Thomas Dulick is the "Manager of Direct Operations" in a branch agency office of Chicago Title in the Kansas City, Missouri area.

152)    Mr. Dulick is listed as the "Manager of Direct Operations" under the "Meet our Staff" page on an agency page for the Johnson and Wyandotte Counties in Kansas.   On the webpage for the "Kansas City Downtown Office" of Chicago Title Insurance Company, Mr. Dulick is listed as the "Manager of Operations, Kansas City Operations".

153)    Upon information and belief, Robert M. Goodside is or was the Division Manager of the Houston Division of the Chicago Title Insurance Company.

154)    Upon information and belief, Mr. Goodside is a retired employee of Chicago Title Insurance Company.

155)   As recently as January 6, 2005, Mr. Goodside was listed as "Vice President – Houston Area Manager" on the Chicago Title insurance Company website for the Houston area branch offices.

156)   Upon information and belief, as of January 6, 2005, Mr. Goodside was one of seven vice presidents in the Houston office alone.

157)   Neither Mr. Dulick nor Mr. Goodside is not identified by Chicago Title Insurance Company as one of its executive officers.

158)   Upon information and belief, Mr. Goodside never served as an executive officer of Chicago Title Insurance Company.

159)   Upon information and belief, Chicago Title Insurance Company is a wholly owned subsidiary of Fidelity National Financial, Inc. (NYSE:FNF) ("FNF").

160)   Upon information and belief and a review of all of FNF's public securities filings available at www.sec.gov, FNF has identified neither Mr. Dulick nor Mr. Goodside as an executive officer of FNF or any of its subsidiary companies, including Chicago Title insurance Company.

161)   The Chicago Title Insurance Company branch offices in Kansas and Houston are each one of over 1,000 branch offices operated by FNF.

162)   Mr. Dulick and Mr. Goodside testified at the Arbitration Proceeding that he was an executive officer of an insurance company.

163)   Agents' counsel, in his July 7, 2010 correspondence to SouthwestRE, represented that Mr. Dulick was an executive officer of an insurance company.

164)    Mr. Dulick and Mr. Goodside, in the September 8, 2010 Arbitration Award, asserted that they, and each of the other arbitrators, satisfied the qualification requirements of the Arbitration Provision.

165)    Each of Mr. Dulick and Mr. Goodside misrepresented their qualifications prior to and during the Arbitration Proceeding, a judicial proceeding under New Mexico law.

166)    By their concurrence, Agents misrepresented the qualifications of Mr. Dulick and Mr. Goodside prior to and during the Arbitration Proceeding, a judicial proceeding under New Mexico law.

### *Mr. Blake Hurst – Not Qualified to Serve as Arbitrator*

167)    Agents identified Mr. Blake Hurst as their selected arbitrator in the June 21, 2010 Arbitration Demand.

168)    Agents, through their legal counsel, represented that Mr. Hurst is an executive officer of an insurance company.

169)    Upon information and belief, Mr. Hurst is a farmer and greenhouse operator who serves as the vice president of the board of directors of Missouri Farm Bureau Insurance Services.

170)    According to his biography as it appears on the Missouri Farm Bureau Insurance Services website (http://www.mofb.com/tb_BOD.htm), Mr. Hurst is the president of the Atchison County Farm Bureau, but is not identified as an executive officer of Missouri Farm Bureau Insurance Services.

171)    The 2009 Annual Report of the Missouri Farm Bureau Federation and Affiliated Companies, which upon information and belief, includes the Insurance Services Division, identifies three "executive officers," none of whom are Mr. Hurst.

172)    Upon information and belief, Mr. Hurst is not an executive officer of an insurance company.

173)    Agents' counsel, in his June 21, 2010 Arbitration Demand, represented that Mr. Hurst was an executive officer of an insurance company.

174)    Mr. Hurst testified at the Arbitration Proceeding that he was an executive officer of an insurance company.

175)    Mr. Hurst, in the September 8, 2010 Arbitration Award, asserted that he, and each of the other arbitrators, satisfied the qualification requirements of the Arbitration Provision.

176)    Mr. Hurst misrepresented his qualifications prior to and during the Arbitration Proceeding, a judicial proceeding under New Mexico law.

177)    By their concurrence, Agents misrepresented the qualifications of Mr. Hurst prior to and during the Arbitration Proceeding, a judicial proceeding under New Mexico law.

**FEDERAL ARBITRATION ACT –THE ARBITRATION PROCEEDING**

178)    The arbitration is subject to the provisions of the Federal Arbitration Act ("FAA"), codified as amended at 9 U.S.C. § 1 et seq. (2002).

179)    Section 10 of the FAA permits a district court, "upon the application of any party to the arbitration," to vacate an arbitrator's award upon one of the grounds listed at 9 U.S.C. § 10(a) of the Federal Arbitration Act. The FAA provides that a court may vacate an arbitration award:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

24

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other  misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so  imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

180)    The Award was procured through arbitration held over the objections of SWRe.

181)    The Arbitrators relied on the Arbitration Provision as the basis for conducting the Arbitration Proceeding.

182)    The Arbitrators exceeded the authority granted to them under the Agent Agreement.

183)    The Arbitrators were not qualified to act as arbitrators pursuant to the Arbitration Provision.

184)    The Arbitrators were guilty of misconduct in asserting that they each satisfied the qualification requirements of the Arbitration Provision.

185)    The failure of the Arbitrators to meet minimum qualifications was prejudicial to SWRe.

186)    The arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown.

187)    The arbitrators were guilty of misconduct in refusing to hear evidence pertinent and material to the controversy.

188)    The arbitrators were guilty of misconduct in their conduct of the hearing by which the rights of SWRe were prejudiced.

25

189)    The award was obtained or the arbitration proceeding was influenced by evident partiality in the arbitrators.

190)    The arbitrators imperfectly executed the powers granted to them in the Arbitration Provision and under the FAA that a mutual, final, and definite award upon the subject matter submitted to them by Agents was not made.

### *The Arbitration Award - Exceeded Jurisdiction*

191)    Arbitration is contractual and the arbitrators derived their authority from the scope of the Agent Agreement.

192)    An arbitration award in the amount of $4.2 million was issued against "Southwest Reinsure, Inc." by the arbitration panel on September 8, 2010, following the arbitration (the "Arbitration Award").

193)    The Arbitration Award included findings of facts including the following:

   a)  That Southwest Reinsure, Inc. "has valid contracts in force with the Petitioners and that said contracts remain in force";

   b)  That "Respondent was provided adequate notice of the cause of the dispute between the parties";

   c)  That such notice was "legal notice";

   d)  That Southwest Reinsure's "failure to respond or negotiate with Petitioners request to resolve the dispute created irreconcilable differences of opinion"; and

   e)  That the Agent Agreements were "valid and enforceable."

180)    Each of the findings of the Arbitration Panel described in the foregoing allegation were matters of New Mexico contract law and outside the authority and jurisdiction of the

arbitration panel.

181)    Matters essential to the issue of whether there existed an arbitrable claim were presented to the Arbitration Panel as part of SWRe's objections and motion to adjourn.  Those matters are set forth, in part, herein.  Such matters are within the exclusive jurisdiction of the court and outside the authority of the Arbitration Panel.

182)    The award of any compensation for Accounts following CAC's termination was outside the scope of the Agent Agreement and therefore beyond the authority granted to the arbitrators.

183)    The compensatory damages award related to commissions payable after the termination of the VSC Program.  The Agent Agreement provides for compensation for services rendered and does not provide for the payment of any prospective commissions or any liquidated damages.  Such an award exceeds the authority of the arbitrators.

184)    Attorneys fees, other than costs of arbitration, are not contemplated in the Agent Agreement.

185)    The award of $1,199,938 in Agents' contingent attorneys fees is an abuse of authority and clearly outside the bounds of any authority granted to any arbitration panel.

186)    During the course of the arbitration, a judicial proceeding in New Mexico, Agents, directly or indirectly through counsel misrepresented (expressly and by omission) numerous material facts to the arbitrators regarding the scope of the arbitrators authority, the terms of the Agent Agreement, policy termination rates and chargebacks, dealer loss rate, the Agent Agreement, CAC commissions, the nature of the CAC Dealer Network relationship and other matters related to SWRe and its ownership.

187)    Agents' misrepresentations are made considerably more egregious by the manner

27

in which they abused the arbitration process by concealing their claims and demands from SWRe and thwarted the ability of the parties to hear and present evidence.

## IMPROPER PARTY

188)    The June 21, 2010 Arbitration Demand from Agents' counsel, Mr. Bartle, notified the "contracting party" "Southwest Reinsure, Inc." of their demand to arbitrate and their selection of an arbitrator.

189)    Southwest Reinsure, Inc. is not a party to the Agent Agreements.

190)    The Award was issued against Southwest Reinsure, Inc.

191)    The Arbitration Provision does not convey the power to the arbitrators to issue an award against Southwest Reinsure, Inc. or any other person or entity that was not a party to the Agreement.

192)    The Award against Southwest Reinsure, Inc. must be vacated.

## DUE PROCESS

193)    The Arbitration Proceeding involving the parties was a judicial proceeding under New Mexico law.

194)    During the course of events leading up to the Arbitration Proceeding, Agents engaged in the following activities:

    (a)  Refused SWRe notice and opportunity to be heard;

    (b)  Ignored the substantive objections of SWRe;

    (c)  prevented SWRe's right to present evidence without unreasonable restriction;

    (d)  Prevented SWRe from reasonably confronting and cross-examining witnesses;

    (e)  Unilaterally selected arbitrators;

    (f)  Select unqualified arbitrators and misrepresented their qualifications;

28

(g) Introduced prejudice and bias into a judicial proceeding;

(h) Refused to identify the basis of the Agents' claim upon request;

(i)  Prohibited the parties from submitting differences to arbitrators;

(j)  Demanded arbitration hearing in the face of SWRe's objections and pending

   judicial proceeding;

(k) Refused to quantify demands;

(l)  Preventing SWRe from establishing a defense;

(m)Misled arbitrators to exceed their authority;

(n) Permitted arbitrators to exceed their authority;

(o) Made demands that were outside the authority of the arbitrators;

(p) Engaged in the unauthorized practice of law.

195)    Agents refused and intentionally withheld from SWRe any notice or reasonable description of their collective claims against SWRe.

196)    Agents refused to identify the specific accounts at issue.

197)    Agents refused to specify the nature and the amount at issue.

198)    Agents refused to provide any information that would have afforded SWRe or any other party supposedly subject to their arbitration proceeding, with notice sufficient to provide such respondents the opportunity to be heard and to offer a suitable defense through collection of evidence and preparation of testimony in advance of the hearing.

199)    Even if the Arbitration Provision was effective, the actions of Agents prevented SWRe the opportunity to comply with such Arbitration Provision, namely the obligation to submit its "differences" to the arbitrators.

200)    The Agents actions intentionally deprived SWRe of its fundamental right of

notice and opportunity to be heard.

201)   The Agents willful failure to notify SWRe of the nature of its claims and the basis for the arbitration prevented SWRe from presenting evidence without unreasonable restriction (or otherwise permitting it to respond to known claims) and effectively prevented it from confronting and cross-examining witnesses.

202)   The Agents actions prevented SWRe from receiving a full and fair hearing on the merits.

203)   The Arbitration Provision, in its application or misapplication by Agents, rendered it procedurally unconscionable because, in effect, it was unreasonably favorable to the Agents while precluding SWRe a meaningful choice or opportunity to defend. The Arbitration Provision, in its application, or misapplication, by Agents, rendered it unreasonably favorable to the Agents and therefore substantively unconscionable.

204)   The manner in which the Agents demanded arbitration, applied and interpreted the Arbitration Provision, failed to perfect the factual predicates to the right to demand arbitration, guided the arbitrators far outside their bounds of authority, in this case, rendered the application and process of the Arbitration Provision to be grossly unfair and one-sided, and therefore substantively and procedurally unconscionable.

205)   The manner in which the Agents demanded arbitration, applied and interpreted the Arbitration Provision, in the in this case, rendered the effect of Arbitration Provision grossly unfair and one-sided, and therefore substantively unconscionable

## COUNT I

## DECLARATORY JUDGMENT

222)   The allegations set forth in the numbered paragraphs above are incorporated into

and made a part of this count.

223)   An actual controversy exists because Agents are pursuing arbitration pursuant to an unenforceable arbitration provision.

224)   SWRe seeks a determination by this Court as to whether the Agent Agreements, and each of them, constitute binding and enforceable contracts with each respective Agent and SWRe.

225)   SWRe seeks a determination by this Court as to whether the arbitration provisions within the Documents, and each of them, are binding and enforceable contractual provisions.

226)   SWRe seeks a determination from this Court whether there is an enforceable agreement to arbitrate.

## COUNT II

## MALICIOUS ABUSE OF PROCESS

227)   The allegations set forth in the numbered paragraphs above are incorporated into and made a part of this count.

228)   Agents initiated the arbitration process without probable cause to believe that the conditions precedent to an arbitrable matter had been satisfied.

229)   Agents' use of process and conduct in the arbitration and in the process leading to arbitration was improper in the regular prosecution of their claims against SWRe.

230)   The irregularities and impropriety of Agents' actions suggest extortion, delay, or harassment.

231)   The use of process in this arbitration was improper in the regular prosecution or defense of Agents' claims

232)   A primary motive of Agents in the use of process was to accomplish an

illegitimate end.

233)    The $4.2 million Award constituted an illegitimate end and represents a clear departure from the scope of the arbitrators' authority under the Agent Agreement.

234)    Agents' malicious abuse of process proximately caused SWRe to suffer damages in an amount to be proved at trial.

**COUNT III**

**WAIVER OF CONTRACT**

235)    The allegations set forth in the numbered paragraphs above are incorporated into and made a part of this count.

236)    In the alternative, Agents impliedly waived contractual rights through their conduct.

237)    SWRe was misled to its prejudice by the conduct of Agents into the honest and reasonable belief that such waiver was intended.

238)    Agents, and each of them, made a misleading representation by conduct.

239)    SWRe had an honest and reasonable belief based on the conduct that Agents, and each of them, would not assert a certain right under the Agent Agreements.

240)    SWRe acted in reliance on the Agents' conduct to its detriment and prejudice.

241)    As a direct result of Agents' implied waiver and subsequent actions, SWRe will and has suffered damages.

**COUNT IV**

**BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

242)    The allegations set forth in the numbered paragraphs above are incorporated into and made a part of this count.

32

243)   The respective Agent Agreement between SouthwestRE and Agents, and each of them, includes an implied covenant of good faith and fair dealing.

244)   By engaging in the practices involving the arbitration process as described above Agents breached the implied covenant of good faith and fair dealing in the Agent Agreement.

245)   Agents' breach of the implied covenant of good faith and fair dealing proximately caused SWRe to suffer harm in an amount to be proved at trial.

## COUNT V

## VACATUR OF THE AWARD

246)   The allegations set forth in the numbered paragraphs above are incorporated into and made a part of this count.

247)   The Award should be vacated under one or more of the bases set forth in Section 10(a) of the FAA.

248)   The Award was issued against Southwest Reinsure, Inc., an entity that was not a party to the Arbitration Provision and was an improper party to the Arbitration Proceeding, and should be vacated.

249)   The Award was procured by undue means.

250)   The Award was procured by the Arbitration Proceedings held over the objections of SouthwestRE.

251)   The Arbitrators relied on the Arbitration Provision as the basis for conducting the Arbitration Proceeding.

252)   The Award was obtained or the arbitration proceeding and process was influenced by evident partiality in the arbitrators.

253)   The arbitrators were guilty of misconduct in refusing to postpone the hearing,

upon sufficient cause shown.

254)    The arbitrators were guilty of misconduct in refusing to hear evidence pertinent and material to the controversy

255)    The arbitrators were guilty of misconduct in their conduct of the hearing by which the rights of SWRe were prejudiced.

256)    The arbitrators exceeded the powers granted to them in the Arbitration Provision.

257)    The arbitrators imperfectly executed the powers granted to them in the Arbitration Provision and under the FAA executed them that a mutual, final, and definite award upon the subject matter submitted to them by Agents was not made.

258)    The arbitration proceeding and the Award must be vacated.

**WHEREFORE**, SWRe respectfully requests that this Court enter judgment for SWRe and against the Agents and offer relief as follows:

(a)    award damages to SWRe in an amount to be determined at trial for Agents' malicious abuse of process;

(b)    vacate the award of the arbitration panel issued following the arbitration held September 8, 2010 in Albuquerque, New Mexico;

(c)    issue a preliminary injunction enjoining and restraining the Agents from proceeding with actions to confirm the arbitration award;

(d)    a declaratory judgment that the Agent Agreements are not valid and enforceable contracts with regard to the CAC Accounts;

(e)    a declaratory judgment that the arbitration was conducted against an entity not a party to the Agent Agreements;

(f)     a declaratory judgment that the matters are not arbitrable under the

        Agent Agreements;

(g)     a declaratory judgment that the conditions precedent to an

        arbitration have not been satisfied;

(h)     a declaratory judgment that the manner in which arbitration

        provision was employed by Agents was unconscionable and that

        the arbitration and the award are unenforceable as a matter of law;

(i)     a declaratory judgment that the arbitration violated SWRe's right

        to due process and the arbitration and the award are unenforceable

        as a matter of law;

(j)     a declaratory judgment that the arbitration provisions within the

        Agent Agreements are not valid and enforceable provisions; and

(k)     a declaratory judgment that this dispute is outside the scope of the

        arbitrations provisions.

                        Respectfully submitted,

                        **SAUCEDO LAW FIRM, P.C.**


                        By: <u>Electronically Signed 10/22/2010</u>
                              Christopher T. Saucedo, Esq.
                              6801 Jefferson St. NE, Suite 410
                              Albuquerque, NM 87109
                              Telephone:  505.338.3945
                              Facsimile:  505.338.3950
                              csaucedo@saucedolaw.com

                              David Abell
                              MENDEL BLUMENFELD, LLP
                              4811 Hardware NE, Suite B-2
                              Albuquerque, NM 87109
                              Telephone:  505.349.8800

Facsimile:  505.212.0014
dabe@acaciapark.com

Clayton E. Crowley
CROWLEY & GRIBBLE, P.C.
4811 Hardware NE, Suite D-5
Albuquerque, NM 87109
Telephone:  505.314.1450
Facsimile:  505.314.1452
cec@cglawfirm.com

*Attorneys for Southwest Re, Inc. and*
*Southwest Reinsure, Inc.*

_____

### CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of October 2010, I filed the foregoing pleading electronically through the CM/ECF system which caused the following parties or counsel to be served by electronic means as more fully reflected on the notice of electronic filing.

Electronically Signed 10/22/2010
Christopher T. Saucedo, Esq.